## THE HARRY E. PACKER.

### THE PURITAN.

#### (District Court, N. D. New York. October 10, 1896.)

1. COLLISION — DUTY OF TUGS — NARROW CHANNEL — NEGLIGENCE — ABANDONMENT OF TOW.

The steamer Packer, in tow of two tugs,—the Gee and the Alpha,—was brought through Peck slip stern foremost, and headed up Buffalo river, the Gee leading. Without warning, the Alpha threw off her line and steamed away, leaving the Gee alone with the steamer. The Packer made no objection to the Alpha's desertion, and the latter claimed to have received an oral command from the Packer to leave, but there was no signal to that effect. Lying in Peck slip, with her stern projecting 25 or 30 feet into the river, was the Denver. Opposite the Denver was another large vessel, leaving a narrow passage. The canal boat Bartholdi was coming down the river, properly towed by the tug Puritan, which had no notice of

danger until within 50 feet of the Gee. The Puritan promptly attempted to avoid collision. The Gee kept straight up the river, and passed safely. The Packer, instead of following the Gee, started her wheel, and ported her helm prematurely, striking the Bartholdi and seriously injuring her. *Held*, (1) that the conduct of the Alpha in abandoning the tow was negligent; (2) that the conduct of the Packer produced the collision; (3) that the Alpha and the Packer were liable for the damage.

**2.** COLLISION—TUGS AND TOWS—SIGNALS—ORAL COMMANDS.

When it is customary for a tug to give orders by signals from the steam whistle to another tug assisting in towing a vessel, the assisting tug should pay no heed to oral orders from the vessel in tow, unless clearly authorized; and if, in obedience to such oral order, the tug abandons the vessel, the abandonment is negligence.

**3.** SAME—MANEUVERING—INADEQUATE HARBOR.

Where the facilities of a harbor are so inadequate as to require maneuvering within narrow limits, vessels must be subjected to stricter rules than they would be in a commodious harbor.

**4.** SAME—DESERTION BY TUG—ACQUIESCENCE—NEGLIGENCE.

If one of the tugs engaged in towing a vessel is permitted to abandon the tow without protest from the officers of the vessel in tow, they, by remaining mute, ratify the act of desertion, and involve themselves in the negligence.

George S. Potter, for libelant.
Martin Carey, for the Packer.
Wilber E. Houpt, for the Puritan.
John W. Ingram, for the Alpha and the Gee.

COXE, District Judge. On the morning of October 22, 1895, the steamer Packer collided with the canal boat Bartholdi in the Buffalo river opposite the dock of the Sturgis Elevator. The canal boat was loaded with wheat and suffered considerable damage. This is another Buffalo collision case where the court is compelled to hold one or more of the vessels at fault while conscious that, primarily, the disaster is due to the wholly inadequate facilities of the harbor. Frequent as collisions are the marvel is that they do not occur daily in these contracted and shallow waterways where the immense and growing commerce of the Lakes is crowded. Steamers, larger than many ocean-going vessels, are compelled to zigzag their way through a channel about 230 feet in width obstructed by narrow draws, lined on both sides with moored vessels and filled with every conceivable moving craft from the bustling canal tug to the stately steel propeller. It is probable that these ever-occurring collisions would presently cease if the court were at liberty to assess the damages so occasioned upon those responsible for the illiberal policy which crowds an imperial commerce into an incapable canal.

At the time of the collision the steamer Denver was lying in Peck slip, her stern extending into the river some 25 or 30 feet. Opposite Peck slip, upon the northerly side of the river, two large steamers, the Iroquois and the Northern King, were moored; while the barge Tempest was moored on the southerly side of the river, near the entrance to the slip. The canal boat Bartholdi was proceeding down the river to a point about a half a mile below the Eastern Elevator in tow of the tug Puritan. The Puritan is a small canal tug about 35 feet in length and 10 feet beam. She is only capable of handling canal boats and other craft similar in size. She was towing in a proper manner on a course about 100 feet from the port

side of the river.   At the same time the propeller Packer, a large
vessel, 225 feet in length, and about 37½ feet beam, was proceed-
ing from the Dakota Elevator in the Blackwell Canal, stern fore-
most, in tow of the two tugs Gee and Alpha, destined for the dock
of the Eastern Elevator.   The Alpha is a large lake tug, 78 feet
in length and 16 feet beam.   The Gee is larger than the Alpha and
one of the most powerful tugs in the harbor.   The three proceeded
through Peck slip, the Alpha leading.   The Packer was then straight-
ened around and proceeded, using her own steam, up the river
bow foremost, in tow of the Gee, the Alpha in the meantime hav-
ing thrown off her line and steamed away.   Opposite the Sturgis
Elevator dock and near the point known as the "Jog," the collision
took place.   The stem of the Packer struck the canal boat on her
starboard bow some six feet from the stem.   At the time of the
collision there was no wind, the day was clear and there was noth-
ing in the elements to interfere with the safe navigation of the
river.

The following diagram, though not purporting to be entirely ac-
curate, will serve to explain the situation.   The dotted line indicates
the course taken by the Packer and the tugs:

The Bartholdi was wholly in the control of her tug.   No one im-
putes fault to her.

### The Puritan.

Was the Puritan negligent?   She was one of the smallest tugs
in the harbor.   She was properly attached to the canal boat and
had proceeded down the river in the usual manner, having taken
all necessary precautions.   When about opposite the dock of the
Eastern Elevator she saw the narrow channel blocked by the Packer
and the tugs.   Thereupon she proceeded with her tow to the East-

ern Elevator dock, or very near the dock. No criticism is made of her course up to this time. While passing through the slip, or immediately thereafter, the Alpha gave a signal indicating that they were coming up the river and warning the vessels coming down "to go slow." No other signal was given by the tugs. The Packer gave no signal at any time indicating her destination. Notwithstanding the testimony of the witness Sheehan that he informed the captain of the canal boat that a boat was coming in there and he would have to get away from the dock, the court is satisfied that the master of the Puritan had a right to suppose and did suppose that the Packer would proceed directly up the river. The first authoritative intimation given the Puritan was when the Gee was about 50 feet distant, when some one on the Gee called upon the Puritan to move away, as the propeller was coming to the dock. This was the first notice of danger. Two courses only were open to the Puritan at that time; one was to pull the canal boat past the "Jog," where they would have rested in perfect safety; the other was to attempt to tow the canal boat up the river. The former seemed to the master of the Puritan the safer course and the court is inclined to agree with him. The other course would have taken more time and would probably have resulted in placing the Bartholdi in a position where the collision would have been more certain and the blow more disastrous. It was clearly the duty of those on the Packer and the Gee, seeing the position of the tug and the canal boat, to give them timely warning and to wait a sufficient time to enable the canal boat to vacate her perilous position. Those on the Gee and the Packer knew precisely their destination. Those on the Puritan supposed, until the danger was imminent, that the Gee and Packer would follow the usual course up the river. There was no occasion for the Packer to head towards the dock while it was occupied by the canal boat and the Puritan. The moment the Puritan saw that the Packer intended to occupy the dock she did her utmost to avoid the accident; that she took the most natural course seems obvious, but even if there were an error of judgment at such time it should not be attributed to the vessel thus placed in jeopardy by the negligence of another. The theory of some of the witnesses on the Packer that the Puritan at first attempted to cross the bows of the Gee and pass on the northerly side of the river, but subsequently changed her mind and endeavored to pull the Bartholdi back to the southerly side, is contradicted by the vast preponderance of evidence and by every presumption in the case. To accept such a theory the court would have to disregard the statements of the most intelligent and disinterested witnesses and at the same time convict the master of the Puritan of phenomenal stupidity.

## The Gee.

There is no testimony criticising the action of the Gee. No witness points out any act on her part which contributed to the accident. The crew of the Gee were not sworn as witnesses for the reason that no accusation was made against them or any of them. Her course seems to have been dictated by prudence and common sense throughout. Had she been aware of the fact that she alone

was in control of the Packer she might have acted with greater caution, but she was not informed of the Alpha's desertion and her conduct must be judged in the light of this circumstance. If the Gee had given notice of the Packer's destination the moment she was straightened around and commenced the voyage up the river instead of waiting until she had reached a point only about 50 feet from the Puritan it is possible that the accident might have been avoided. But with the Alpha in position at the propeller's stern the latter was under perfect control and the notice in these circumstances was not absolutely necessary. Negligence cannot be predicated of failure to notify the Puritan when the Gee supposed and had a right to suppose that with the Alpha's assistance she could proceed as she did with absolute safety. After it became evident that a collision was probable the Gee followed the only course open to her and she did so with prudence and celerity. She could have done nothing more. The court naturally hesitates to find unskillful seamanship where the experienced navigators of the harbor have failed to point out any negligent act although many of them represent interests that are opposed to the Gee. It is thus apparent that the collision was the result of negligence on the part of the Alpha and the Packer, one or both. No other hypothesis is possible, there being no pretense of inevitable accident.

## The Alpha.

It is conceded on all sides that the accident could have been avoided had the Alpha remained in her position at the Packer's stern. The desertion of the Packer by the Alpha was a grave fault. This proposition is asserted by many of the witnesses and is denied by none. There is a sharp dispute as to which vessel was responsible for the desertion, the Alpha insisting that she acted pursuant to orders from the Packer. The Packer emphatically denies this. The Alpha and the Gee had been employed to take the Packer to the Eastern Elevator dock and not to the Peck slip junction. They were paid to see that the propeller was safely moored at the elevator dock; they were not paid to abandon her at the most dangerous part of the journey. With the stern of the Denver projecting into the stream and the Iroquois lying directly opposite it requires little technical knowledge to perceive that it was by no means a simple maneuver to tow a large vessel through this narrow jaw and moor her at the dock immediately thereafter. The price paid, or agreed to be paid, insured the presence of the Alpha until the dock was reached. What object the Packer could have in driving the Alpha away it is not easy to imagine. It cost nothing to keep her and it was much safer to do so. If, then, the Alpha voluntarily steamed away it was an inexcusable fault. This proposition is too plain to be controverted. The court is convinced that neither the master nor the second mate of the Packer gave the order to "let go;" first, because both deny it and, second, because, as before stated, every possible presumption is against it. It is contrary to the rules that govern human conduct to suppose that these men would give an order which by no possibility could benefit them and which might bring disaster and loss. It is possible that some one

on the Packer may have given the order, or called out something which the master of the Alpha mistook for an order. If this be so, if he steamed away pursuant to the direction of some unauthorized person on the Packer, not having the attributes of authority, it is still a serious question whether his desertion did not constitute negligence.

It is in proof that these orders are given, customarily, by signals from the steam whistle. The Alpha was under the direction of the Gee and bound to obey her signals. Whether, under such circumstances, she was called upon to heed the Packer's whistle may even be doubted, but it seems reasonably clear that she was not called upon to obey an oral order coming somewhere from between-decks. The Packer was in charge of the tugs. It was for them to direct her course. It was their duty to stand by until they had performed the service which they set out to perform. The Alpha was supposed to know the dangers of the harbor much better than the Packer. The Packer recognized this when she surrendered herself to the direction of the tugs. If there were to be a change in the programme it was incumbent upon the Alpha to be sure that the orders were authentic. She was not required under such circumstances to heed every random order from the propeller. Obviously the safe course for her was to stay by until her contract was terminated. If she saw fit to leave before she did it at her own risk.

Although the court inclines to the opinion that there was negligence in the Alpha's abandonment of the Packer even upon the theory that she received oral directions from the latter to take this course it is unnecessary to decide the proposition for the reason that it was clearly the duty of the Alpha, when she left, to signal the Gee that she had done so. The Gee was the directing tug and entitled to notice. No signal was given. This was an obvious fault. It is no answer to say that the Packer should have notified the Gee. It does not exculpate the Alpha to prove that the Packer also was at fault. Neither is it an answer to argue that the subsequent course of the Gee indicated at the moment of the collision she knew of the Alpha's departure. The two tugs were partners, one of them deserted the enterprise without informing the other. If she had remained the collision could have been prevented. It is idle to speculate as to what might have been the course of the Gee if she had been given timely intimation of the Alpha's action. Neither is it necessary to hold that her course would have been different had she known that the Alpha had abandoned her. It is reasonable to suppose that she would have proceeded with greater caution, that she would have given the Puritan more seasonable notice and would not have attempted to make the dock until the Puritan and her tow were out of danger. It is enough that the Alpha omitted to give the information to which the Gee was certainly entitled, and for a fault so patent she must be held liable. Should the court exculpate her the holding might lead to dangerous results. If the Alpha could desert with impunity so could the Gee and the propeller be left wholly without help. Should such a rule obtain the employment of tugs for the purpose of making navigation safe would be a delusive sham.

## The Packer.

The Alpha having deserted, the Packer, with steam up, was left in charge of the Gee, to proceed a few hundred feet to her dock. Not a very difficult task it would seem! The collision cannot be attributed solely to the Alpha's negligence, unless it be said that it is impossible for a single tug to tow a propeller to her dock, distant less than a quarter of a mile. To assert this is, of course, absurd. If the court be right in its conclusions thus far it follows, as a necessary presumption, that the Packer was at fault. The Puritan, the Bartholdi and the Gee being without blame and the fault of the Alpha being one that diligence could have remedied it is clear that if the accident was the result of carelessness it must have been the carelessness of the Packer. Of course those who assert the affirmative of this proposition are not permitted to rely wholly upon inference, they must prove wherein the Packer was at fault. If it were a fault in the Alpha to abandon the Packer it was equally a fault in the latter to order the former to leave her. There is no escape from the proposition that if the Alpha was ordered away the Packer was at fault.

As previously stated the court is of the opinion that neither the master nor the second mate gave the order. If the order were given by some one between decks and heard by the mate he should have countermanded it. By remaining mute and seeing the order executed he ratified it. Assuming that no order was given was he free from blame? It is undisputed that he saw the Alpha's action and assisted in getting in the line. He knew that there had been no signal from the Gee or his own vessel authorizing the desertion. He knew that the Packer was destined for the Eastern dock and that the tugs had been employed to take her there, and yet he permitted one of them to leave his vessel in the lurch without a word of protest. He demanded no explanation and did not report the occurrence to his own master. If he had made the least demur it is certain that the Alpha would have remained. Can it be said that this was good seamanship? Is it not plain that the Alpha's departure was so participated in by both crews that it is difficult to predicate negligence of the Alpha's acts of commission without drawing the same conclusion from the Packer's acts of omission? In charging the Alpha with gross negligence the Packer involves herself as well. At least she acquiesced in the Alpha's fault. Test it in this way: Suppose the Gee had also attempted to abandon the Packer after the latter had passed the stern of the Denver? No one would doubt the gross negligence of the act. But suppose, further, that the Packer had made no protest, offered no objection and issued no order, but had, on the contrary, quietly assisted the Gee to get away. Would not the injured vessel have a right to complain of the negligence of both vessels in agreeing to a programme so absolutely indefensible? True, the second mate says that he supposed the tugs knew their business and were acting properly, but it is doubted if this be a sufficient excuse for what, to say the least, was most unfortunate supineness. The subsequent course of the Packer was even more unwise. She knew that the Alpha had left. She knew that the canal boat was at the dock.

She knew, in the language of her advocate's brief, that "the Gee had entire and exclusive charge of the tow" and that it was her duty to follow the Gee and obey her orders. Instead of doing this she started her wheel and ported her helm prematurely so that the Gee lost control. There is no pretense of any abnormal conditions which would account for the very pronounced sheer of the Packer. Had she proceeded her bow would have struck the Eastern dock near the engine house. If she had followed the Gee she could not have taken this sheer. It must have been produced by faulty seamanship on the Packer. There is no other explanation. The Gee passed the canal boat in perfect safety. The Packer would have done likewise if she had followed the Gee. There was no necessity for making the dock at the point indicated. It would seem that a better landing could have been made had she pointed 200 feet further up the dock. The canal boat was at best in a precarious position, and, had the Packer remained in the center of the river, the Puritan could have hauled the canal boat to a place of safety. The delay of a minute or two would have insured absolute safety. Prudence demanded this course, but instead of taking it the Packer, acting entirely on her own responsibility, started her own machinery, headed directly for the canal boat and did not attempt to reverse until it was too late. It is thought that it is impossible to exculpate the Packer upon this proof.

There are so many actors in this transaction, their interests are so conflicting and the testimony so contradictory that it is by no means an easy task to ascertain the truth. As stated at the outset the theater of operation at Buffalo is so circumscribed that vessels there must be subjected to stricter rules than if maneuvering in different environment. Faults which in a commodious harbor would be deemed trivial may here lead to the most disastrous results. Starting with the conceded proposition that the collision was the result of human fault, and, bearing in mind that in other surroundings the designated negligence might be looked upon as venial, an earnest effort has been made to locate the responsibility properly.

The following propositions are, it is thought, established: First. The conduct of the Alpha in abandoning the tow was negligence. Second. This act of the Alpha did not produce the collision. Had she remained she could have prevented it, but her going did not cause it. Third. Assuming that the Puritan was without fault there must have been carelessness on the part of the Gee or the Packer after the Alpha's desertion. Fourth. The testimony fails to disclose any negligence on the part of the Gee. Fifth. The conduct of the Packer was sufficient to produce the collision and that it did so is the only plausible conclusion from the proof. Sixth. If the Puritan occupied the position testified to by the canal boat's captain and her own crew there can be no pretense that she was negligent. The witnesses who place her at the upper end of the Eastern dock are thought to be mistaken.

It follows that the libelant is entitled to a decree against the Alpha and the Packer with costs and a reference to compute the amount due. As to the Gee and the Puritan the libel is dismissed.